# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| JOSHUA CACHO, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | No. 3:25-cv-00169-KC |
| ROBERTS MARKLAND, LLP, LAW | § | |
| OFFICE OF TRE MEREDITH, PLLC, and | § | |
| QUINTESSA LLC, | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF LAUREN VON MINGEE

My name is Lauren Von Mingee. My former name is Lauren Von McNeil. My date of birth is January 22, 1986, and my business address is 3401 NW 63rd Street, Suite 555, Oklahoma City, Oklahoma 73116.

1.    I am over the age of eighteen, of sound mind, and have never been convicted of a felony. The facts stated herein are within my personal knowledge and are true and correct.

2.    I am the CEO, founder, and sole owner of Quintessa LLC ("Quintessa"), a Defendant in the above captioned lawsuit, *Joshua Cacho v. Robert Markland, LLP, et al.*, Case No. 3:25-cv-00169, pending in the United States District Court for the Western District of Texas, El Paso Division.

3.    I make this declaration in support of Quintessa's Rule 12(b)(2) Motion to Dismiss.

4.    Attached to this declaration as **Exhibit A-1** are true and correct copies of two e-mails that Quintessa's prior legal counsel from an unrelated matter received from Plaintiff on April 17 and April 18, 2025.

5.    Quintessa specializes in giving personal injury law firms a competitive edge in scaling their practices by delivering high-quality leads. Quintessa operates its own highly trained intake department that gathers necessary information from potential new clients, vets them, and then signs them up on a law firm's retainer agreement. Quintessa's intake department is located in Oklahoma City, Oklahoma.

6.    Quintessa does not market and has never engaged in marketing "debt relief services and products."

7.    Attached to this declaration as **Exhibit A-2** is a true and correct copy of the Master Services Agreement between Quintessa and Kareemiya Technologies & BPO d/b/a Auto Claims Solutions ("Kareemiya"), effective July 23, 2024.

8.      Kareemiya is a marketing company that Quintessa purchases leads from. Quintessa does not own, control, or direct Kareemiya's marketing activities or telemarketing practices. Kareemiya is not an agent of Quintessa nor is Kareemiya authorized to act as an agent of Quintessa.

9.      In Section 13 of the MSA between Quintessa and Kareemiya, the parties agreed that neither entity would act as a partner, joint venture, employee, or agent of the other.

10.      It is the regular practice of Quintessa to maintain a call log of calls that were placed by Quintessa's intake department, received by Quintessa's intake department, or transferred to Quintessa's intake department.

11.      Attached to this declaration as **Exhibit A-3** is a true and correct copy of Quintessa's call log showing all calls Quintessa placed or received, or that were transferred to Quintessa, involving Plaintiff's phone number ending in "5482" from January 1, 2025 to July 16, 2025.

12.      Quintessa did not place, authorize, ratify, or control, and was not involved in any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on March 24, 2025, at 12:37pm MST. Quintessa does not own or operate the Caller ID "915-231-6312".

13.      Quintessa did not place, authorize, ratify, or control, and was not involved in any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on March 25, 2025, at 1:37pm MST. Quintessa does not own or operate the Caller ID "915-231-6369".

14.      Quintessa did not place, authorize, ratify, or control, and was not involved in any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on April 2, 2025, at 5:47pm MST. Quintessa does not own or operate the Caller ID "915-231-6829".

15.      Quintessa did not place, authorize, ratify, or control, and was not involved in any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on April 16, 2025, at 10:48am MST. Quintessa does not own or operate the Caller ID "915-213-6103".

16.      Quintessa did not place, authorize, ratify, or control, and was not involved in any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on April 17, 2025, at 5:17pm MST. Quintessa does not own or operate the Caller ID "915-231-6507".

17.      Quintessa did not place, authorize, ratify, or control, and was not involved in any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on April 17, 2025, at 5:24pm MST. Quintessa does not own or operate the Caller ID "915-562-1991".

18.      Quintessa did not place, authorize, ratify, or control, and was not involved in the placement of any call that may or may not have been placed to Plaintiff's phone number ending in "5482" on April 17, 2025, at 5:34pm MST. Quintessa does not own or operate the Caller ID "915-821-2659".

19.      On April 17, 2025, at or around 5:36pm MST, Quintessa received a live transfer of a call from Kareemiya. During this call, Plaintiff spoke to a Quintessa intake representative named Lauren for approximately 8 minutes. Plaintiff told Lauren that he was in a car accident and details about the accident and his injuries. After Lauren described that she would match Plaintiff with a law firm that could assist with representing Plaintiff related to his accident, Plaintiff indicated that he was interested in using Quintessa's services and continued the conversation. Approximately 4 minutes into the call, Plaintiff asked if Lauren could provide him with a callback number in case the call got disconnected and agreed that Lauren could text the information to him. The call was later

disconnected when Plaintiff hung up mid-sentence while discussing the accident and the damage to his car.

20.     Lauren attempted to reconnect with Plaintiff by calling his number at 5:44 pm MST and 5:50 pm MST. Lauren and Plaintiff briefly spoke during the 5:44 pm call, but the call was again disconnected when Plaintiff hung up. Lauren then sent Plaintiff a text message that said "We just got disconnected. I'll try again in 5 mins."

21.     Plaintiff then called Quintessa's intake department three times, twice using the callback number Lauren had previously provided to Plaintiff via text. Plaintiff's first two calls to Quintessa were placed at 5:56 pm and 5:57 pm MST. Plaintiff terminated both calls in queue after less than 30 seconds. Plaintiff's third call to Quintessa was placed at 5:57 pm MST. Plaintiff was connected to another Quintessa intake representative named Bridgett. After Plaintiff explained that his call with Lauren got disconnected, Bridgett transferred Plaintiff to another Quintessa intake representative named Laura.

22.     When Laura answered the phone, she explained that Lauren was on the other line, so she (Laura) could continue the conversation instead. Plaintiff spoke to Laura for approximately 45 minutes. Notably, Plaintiff made several irrelevant comments to elongate and sidetrack the conversation, such as asking Laura if he could "take her out" and if she had ever seen a tornado. Laura explained in detail how the attorney retention processed worked and that Plaintiff had matched with the attorneys at Roberts Markland, LLP. After confirming the basic details of Plaintiff's accident and injuries, Laura asked whether Plaintiff would like the retainer agreement for Roberts Markland to be sent to Plaintiff by text or by e-mail. Plaintiff instructed that Laura send the retainer agreement to Plaintiff's e-mail. After Plaintiff confirmed receipt of the retainer agreement, Plaintiff and Laura walked through the retainer agreement together. Plaintiff then responded that he realized how serious this was, that he just wanted "a day" to review the retainer agreement before signing, and that he assured Laura multiple times that he would call her back. When Laura asked if Plaintiff wanted to talk to Roberts Markland before he signed, Plaintiff stated that he would want to have a call with Roberts Markland "tomorrow."

23.     The next day, April 18, 2025, Laura called Plaintiff at 12:40 pm MST. After confirming that it was Laura calling, Plaintiff said, "I went over everything and I'm sorry, I had a change of heart. I don't want to do this. Please make sure they don't call me."

24.     On April 19, 20, and 22, 2025, Plaintiff received follow-up texts from Quintessa related to whether Plaintiff had signed the retainer. These text messages stated that they were from the Car Accident Helpline (which is a d/b/a of Quintessa), provided Plaintiff with Quintessa's callback number, and indicated that Plaintiff could reach Quintessa via text or phone.

25.     Quintessa did not place, authorize, ratify, or control, and was not involved in any text message that may or may not have been sent to Plaintiff's phone number ending in "5482" on April 21, 2025 at 7:30am PST. Quintessa does not operate the Caller ID "713-630-0900."

26.     Quintessa has not received a written DNC request from Plaintiff. After Laura's call with Plaintiff on April 18th, Plaintiff's phone number ending in "5482" was placed on Quintessa's internal do-not-call list effective on or around April 19th, and on Quintessa's internal do-not-text list effective on April 22nd.

27.     Quintessa has an internal, written do-not-call policy. Quintessa's employees are trained on the existence and use of Quintessa's internal do-not-call list and internal do-not-call

policy. Plaintiff has never asked Quintessa whether Quintessa had an internal do-not-call policy or whether Quintessa maintained an internal do-not-call list. Plaintiff has never requested from Quintessa a copy of Quintessa's internal do-not-call policy. Plaintiff has never asked Quintessa whether Quintessa's employees are trained on the existence and use of Quintessa's internal do-not-call list or internal do-not call policy. Plaintiff has never requested any information on the training Quintessa's employees receive on the existence and use of Quintessa's internal do-not-call list and internal do-not-call policy.

28.     Roberts Markland, LLP ("Roberts Markland") and the Law Office of Tre Meredith, PLLC ("Tre Meredith") are clients of Quintessa, meaning that Quintessa sends personal injury leads to them.

29.     Quintessa does not perform marketing on behalf of any individual law firm. Rather, Quintessa markets its own services of connecting injured accident victims with attorneys who may be able to help them. As such, neither Roberts Markland nor Tre Meredith hired Quintessa to conduct marketing on their behalf.

30.     Moreover, Quintessa has a standard list of qualification criteria for the leads that it provides to law firms. That list of criteria is determined by Quintessa and not by the law firms that purchase leads from Quintessa.

31.     Quintessa creates its own scripts for its call center agents to follow when vetting leads and matching them with law firms. Quintessa has spent a significant amount of time, money, and effort developing and fine tuning its scripting and considers its scripts to be proprietary. Quintessa's scripting is not dictated by the law firms that purchase leads from Quintessa.

32.     When Quintessa initially connects with a potential client on the phone, Quintessa has not yet determined if the potential client will meet its lead qualification criteria or which law firm the potential client will be matched with if the lead does meet the qualification criteria. As such, when Quintessa receives or places calls to potential clients, it is not acting as an agent of any law firm.

33.     Roberts Markland and Tre Meredith did not "hire[ ] Quintessa to market their legal services, knowing that any client sent to Markland and Meredith by Quintessa would come from illegal telemarketing conducted by Quintessa," did not "hire[ ] Quintessa as an end-around to the" American Bar Association's and Texas State Bar's "marketing prohibition," did not "authorize[ ] Quintessa to market their legal services," do not "set requirements for Quintessa to qualify potential clients," did not "write" or "approve[ ] the script[ ] Quintessa used to market the[ir] legal services," do not "instruct Quintessa on which states to call and set the minimum qualifications to qualify the prospective clients," do not "pay Quintessa directly for each referral due to [any] illegal solicitation telemarketing calls made," and do not "have a contract with Quintessa appointing Quintessa as their sales agent," as alleged in Plaintiff's Complaint.

34.     Roberts Markland and Tre Meredith are not agents, salespersons, or representatives of Quintessa, and are not authorized to act or hold themselves out as agents, salespersons, or representatives of Quintessa. Roberts Markland and Tre Meredith do not own, control, or direct Quintessa's marketing activities or call placement practices.

35.     Quintessa is not an agent, salesperson, or representative of Roberts Markland or Tre Meredith, and is not authorized to act or hold itself out as an agent, salesperson, or representative of Roberts Markland or Tre Meredith. Quintessa does not own, control, or direct Roberts Markland's or Tre Meredith's marketing activities or telemarketing practices.

I declare under penalty of perjury that the foregoing declaration is true and correct and within my personal knowledge.

Executed in Oklahoma City, Oklahoma, on July 18, 2025.

_Lauren Mingee_

**Lauren Von Mingee**
CEO/Founder
Quintessa LLC