# EXHIBIT A-2

**QUINTESSA MARKETING**
**MASTER SERVICES AGREEMENT**

This Master Services Agreement (the "Agreement") is made and entered into between Quintessa LLC ("Quintessa") and Kareemiya ("Advertiser") (collectively, the "Parties"). This Agreement shall be deemed effective as of the date the Agreement is signed and dated by an authorized representative of both Parties (the "Effective Date").

In consideration of the mutual promises and covenants stated in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **Definitions**:    Where used herein, the definitions set forth in "**Exhibit A**" to this Agreement shall apply. Unless specifically defined in Exhibit A, or below, all other words, terminology, and phrases used in the terms and throughout the Agreement should be understood as having their plain and ordinary meaning.

2.    **Nature of Agreement / Deliverables**: Quintessa engages Advertiser to produce and transmit to Quintessa certain Deliverables as set forth in an applicable IO. Quintessa shall pay Advertiser for such Deliverables in accordance with the terms of this Agreement and the applicable IO. The Deliverables may include:

   a) **Call Leads** that are derived from Advertisements and that meet all requirements specified in an IO;

   b) **Lead Data Acquisitions** that are derived from Advertisements and that meet all requirements specified in an IO; and

   c) **Other Lead-Related Deliverables** that are derived from Advertisements and that meet all requirements specified in an IO.

3.    **Insertion Orders and Delivery**:    Before any Deliverables are provided, the Parties must agree to an IO in accordance with the following terms:

   a.    Each IO shall state, at a minimum: (a) the nature or a description of the Deliverables, (b) the price(s) for such Deliverables, (c) the start and end dates for the Campaign(s), as may be applicable, and (d) the anticipated delivery date(s) for the Deliverables. Each IO may also include: (a) the maximum amount of money to be spent for the Campaign(s) or the IO, (b) requirements or qualifiers for Deliverables, (c) volume restrictions for Deliverables, (d) return or rejection caps for Deliverables, (e) the states or territories from which Deliverables may originate, and (f) any other information relevant to the IO as may be necessary for the completion and intended purpose of the Order.

   b.    Unless specified in an applicable IO, the method of delivery for any Deliverables shall be at Quintessa's sole discretion.

   c.    Unless otherwise specified in an applicable IO, all Orders and Deliverables will be deemed to have been "delivered" as of the date of transmittal to Quintessa, unless Quintessa notifies Advertiser within three (3) business days after the anticipated delivery date for the Deliverables specified in an IO that delivery was not received on the transmittal date.

d. Any IO entered into pursuant to this Agreement shall be deemed subject to these terms.  If the terms and conditions of any such IO conflict with or contradict any of the terms of this Agreement, the terms of this Agreement shall control and govern. Any IO, or any modifications to an originally submitted IO, must be in writing and shall be binding only when signed by an authorized representative of both Parties.

4. **Billing, Invoicing, and Payment**:  Except as otherwise provided in this Agreement or in an applicable IO, the following requirements shall apply to billing, invoicing, and payment liabilities for all services performed and all Deliverables provided under this Agreement:

a. Quintessa shall pay Advertiser for all Orders and Deliverables on a net 30 basis.

b. All amounts billed by Advertiser will be based upon Quintessa's good-faith computation of the numbers of Deliverables provided.

c. The Parties acknowledge and agree that only those Deliverables meeting all requirements of this Agreement and any applicable IO shall be billable to Quintessa.

d. Quintessa and Advertiser shall be solely responsible for all costs they each respectively incur in connection with this Agreement, including, without limitation, expenses associated with creating, editing, maintaining, updating and otherwise managing Advertisements, Advertising Materials, Sites, or Pages, making any Calls, providing the Deliverables, etc.

5. **Cancellation / Termination**:  All cancellations and/or terminations pursuant to this Agreement are subject to the following terms:

a. This Agreement shall be deemed as continuing and in effect as of the Effective Date and at all times thereafter unless terminated in accordance with this Section or unless specified in an IO, provided however that termination shall not impact any remedies provided in this Agreement or by applicable law. Notwithstanding the above, either Party may terminate this Agreement (including any IO) for any reason upon providing fourteen (14) days prior written notice to the other Party. In the event of a cancellation or termination, each Party shall remain responsible for performing all duties and obligations under this Agreement or any IO through the date of final termination (i.e., Deliverables obligations, payment obligations, etc.).

b. Any terms of this Agreement which, by their very nature, are intended to survive any expiration or termination hereof, shall so survive, including without limitation, the provisions respecting confidentiality, representations and warranties, indemnification, limitations on liability, and dispute resolution.

6. **Legal and Other Compliance**:  The following terms apply to this Agreement and all IOs:

a. **Call Leads.**  To the extent Quintessa orders Call Leads, Advertiser shall be required to obtain Consent prior to making or initiating any Automated Calls pursuant to this Agreement and shall not contact any Consumers who have "opted-out" from receiving future Advertisements or Calls and/or have requested to be placed on Quintessa's or Advertiser's DNC list. Advertiser  shall be required to ensure that the Consent and all Calls made or initiated pursuant to this Agreement comply with the TCPA and other local, state and federal laws and regulations applicable to telemarketing. Automated Calls for which Advertiser has not

Page **2** of **9**

obtained Consent or Calls made to Consumers who had opted-out or requested to be placed on a DNC list prior to such Call shall not be billable and shall not be delivered to Quintessa. With Respect to all Call Leads transferred to Quintessa by Advertiser, Advertiser shall, within thirty (30) seconds after completing the call transfer, end its connection to the call and cease all recording of the communications between the Consumer and Quintessa.

b. **Lead Data Acquisitions.** To the extent Quintessa orders Lead Data Acquisitions or Other Lead-Related Deliverables, Advertiser shall obtain Consent to contact from the Consumer and ensure that the Consent and all Lead Data Acquisitions acquired pursuant to this Agreement comply with the TCPA, CCPA, CASA and other local, state, and federal laws and regulations that may be applicable to this Agreement (including but not limited to the CAN-SPAM Act of 2003 and the Telemarketing Consumer Fraud and Abuse Prevention Act).

7. **Additional Advertiser Requirements**: As part of its obligation to obtain Consent from each Consumer, Advertiser shall be required to utilize Trusted Forms on all Advertisements that Advertiser uses to generate leads for Quintessa. Advertiser further agrees that it will provide Quintessa with the Trusted Forms link that will allow Quintessa to access and review the playback video showing any Consumer lead entering his/her contact information and opting in/consenting to communications from Advertiser and Quintessa.

8. **Representations and Warranties Regarding Advertisements**: Advertiser represents and warrants that: (i) it owns and/or has the legal right to use, distribute, publish and transmit all Advertisements used to generate the Deliverables under this Agreement and all IOs, as of the Effective Date and at all times thereafter; (ii) the Advertisements or the content thereof contain no unlawful or offensive materials, and do and will not infringe on the rights of any third parties or violate any foreign or domestic federal, state, or local law, rule, regulation, or statute, including but not limited to the CCPA, CASA, or TCPA; and (iii) Advertiser has not and will not use any Deliverables under this Agreement in violation of any foreign or domestic federal, state, or local law, rule, regulation, or statute or in a manner that infringes upon the privacy rights of any Consumers or other third parties, including in particular but not limited to the CAN-SPAM Act, CCPA, CASA, TCPA, or FCRA. Additionally, Advertiser expressly warrants that it (including all of its parent, subsidiary, and affiliate companies) implements and utilizes Trusted Forms on all websites and marketing media from which it generates Consumer leads transmitted to Quintessa.

9. **Indemnity and Defense**: Except as otherwise provided or limited in this Agreement, the Parties agree to the following indemnity and defense obligations:

a. Advertiser agrees to defend, indemnify and hold Quintessa and its respective parents, subsidiaries, affiliates, agents, partners, officers, directors, employees, successors and assigns harmless from and against any and all losses, damages, liabilities, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind (including reasonable attorneys' fees) (collectively "Losses") incurred as a result of any claim, judgment, action, lawsuit, or proceeding by a third party individual or entity arising out of, relating to, or in connection with: (i) Advertiser's Advertisements or Web Content; (ii) Advertiser's agent's or representative's duties under any of these terms or the terms of any related IO, including without limitation any breach of the representations and warranties in Section 7 above or the legal compliance obligations in Section 6 above; and (iii) claims alleging infringement of copyrights or other intellectual property rights or violation of rights of privacy or publicity, including but not limited to TCPA, CCPA, CASA, or FCRA claims, or any violation of any law, rule, statute or regulation applicable to Advertiser or its Advertisements.

Page **3** of **9**

b. If any third-party claim, suit, or proceeding is brought against Quintessa concerning any matter for which indemnity may be sought from Advertiser, Quintessa will: (i) provide reasonable cooperation to Advertiser, at Advertiser's expense, in connection with the defense or settlement of any such claim; and (ii) be entitled to participate at its own expense in the defense of any such claim.

c. In exercising the right to indemnification under this Agreement, Quintessa shall be required to provide reasonably prompt written notice to Advertiser of any third-party claims, suits, or proceedings, and, in said notice, request that Advertiser immediately tender defense of all such claims for which identification is sought hereunder.

d. In all instances, Quintessa agrees that the Advertiser will have sole and exclusive right to control the defense and settlement of any such third-party claim. However, Advertiser will not acquiesce to any judgment or enter into any settlement that adversely affects Quintessa's rights or interests without the prior written consent of Quintessa, which shall not be unreasonably withheld.

**10.** **Limitation of Liability: QUINTESSA SHALL NOT BE LIABLE FOR UNLAWFUL ACTS BY ANY OTHER PERSON OR ENTITY IN RELATION TO THIS AGREEMENT, NOR FOR THE CONTENTS OF ANY ADVERTISEMENTS, PAGES OR SITES FROM WHICH ANY DELIVERABLES ARE GENERATED. IN ADDITION, QUINTESSA SHALL NOT BE LIABLE FOR ANY LOSS, COST, DAMAGE OR EXPENSE (INCLUDING LEGAL FEES) INCURRED BY ADVERTISER IN CONNECTION WITH ANY ADVERTISEMENTS, CONTACTS MADE TO CONSUMERS, OR THEIR PARTICIPATION IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, FOR ANY TECHNICAL MALFUNCTION, COMPUTER ERROR OR LOSS OF DATA OR OTHER INJURY, DAMAGE OR DISRUPTION TO ADVERTISER'S ADVERTISEMENTS. IN NO CIRCUMSTANCES SHALL QUINTESSA BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR QUINTESSA'S PERFORMANCE THEREOF (INCLUDING BUT NOT LIMITED TO ANY ALLEGED TCPA OR CCPA VIOLATIONS), EVEN IF SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT QUINTESSA HAS BEEN ADVISED OF THE POSSIBILITY THEREOF.**

11. **Non-Disclosure and Confidentiality:** Throughout the course of the Parties' business relationship, Advertiser, its employees, agents, and personnel may come into possession of or obtain certain information from Quintessa which Quintessa deems to be confidential ("Confidential Information"). Such Confidential Information shall include, but shall not be limited to (i) any form of marketing plan, strategies, financial information or projections, operations, sales quotes or estimates, business plans, performance results which may be related to the past, present and/or future business activities of said Party, its subsidiaries and associated companies; (ii) plans for products or services, and customer or supplier lists; (iii) any scientific, technical or data information, invention, design, process, procedure, formula, improvement, technology or method; (iv) any concepts, reports, data, knowledge, works in progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets, trademarks and copyrights; (v) business practices or models; (vi) business relationships with any other customers, clients, or partners; (vii) intake services, methods, scripts, or best practices; and (viii) any other information that Quintessa reasonably considers to be Confidential Information. Confidential Information need not be novel, unique, patentable, copyrightable or constitute a trade secret in order to be designated Confidential Information. Advertiser acknowledges that all Confidential Information is proprietary to Quintessa, has been

Page **4** of **9**

developed and obtained through great efforts, and that Quintessa regards all of its Confidential Information as trade secrets.

Advertiser, including all of its employees, agents, and personnel, hereby agrees to keep all Confidential Information strictly confidential and promise not to disclose, distribute, or broadcast such information to any third party, by any means, and under any circumstances. Furthermore, Advertiser agrees to make use of the Confidential Information solely for the purpose and in connection with the current or contemplated business relationship between the Parties and not for any purpose other than that which has been stipulated and contained herein this Agreement, unless otherwise authorized by prior written consent by an authorized representative of Quintessa. Advertiser shall have no other right or license, whether expressed or implied, in the Confidential Information accessed hereunder. Ownership and title to the Confidential Information shall remain solely with Quintessa, any and all use of the Confidential Information by Advertiser shall be solely for the benefit of Quintessa.

Additionally, Advertiser and Quintessa shall hold this Agreement and all of its terms in strict confidence and shall not disclose it or its terms to any other person or entity, except (1) their respective financial or tax accountants, advisors, consultants, attorneys, or any agents or employees who have a business reason to know; (2) as may be required in connection with any action to enforce the Agreement; (3) as may be required by a judicial or regulatory body; (4) as is reasonably necessary to the defense of any action to which the terms of this Agreement may apply; or (5) as otherwise required by law.

12.    **Solicitation / Circumvention**: Advertiser and Quintessa both agree that, during the term of this Agreement and for a period of two (2) years thereafter, they shall not knowingly 1) interfere with or circumvent the other party's business relationship with any existing customer, client, firm, vendor, or contractor, or 2) solicit for employment or hire any then-current employee of the other party.

13.    **Relationship of the Parties**:  Each Party to this Agreement shall be and act as independent contractor and not as partner, joint venture, employee, or agent of the other.

14.    **Authority**:  The Parties warrant and represent to one another that they have full power and authority to sign and enter into this Agreement, carry out their respective obligations, and to be bound by this Agreement. The Parties further represent that all necessary action has been taken to authorize the execution and delivery of this Agreement.

15.    **Modifications and Waivers**:  No waiver, modification or addition to this Agreement shall be valid unless in writing signed by the Parties. The failure of any Party to insist upon compliance with any of the provisions of this Agreement, or a waiver in a particular instance, shall not be construed as a general waiver or relinquishment by such Party or a waiver of any other provision of this Agreement.

16.    **Governing Law**: The validity, construction, and interpretation of this Agreement, and the parties' business relationship and conduct with respect to this Agreement, shall be governed and enforced in accordance with the laws of the State of Oklahoma, without regard to any choice of law principles.

17.    **Mandatory Arbitration / Waiver of Jury Trial and Class Actions**:  Except as otherwise provided below, in the event of any dispute, claim or controversy between or among the Parties to this Agreement arising out of or relating to this Agreement (including any IO) or any breach thereof, including, without limitation, any claim that this Agreement or any of its parts is invalid, illegal or otherwise voidable or void, whether such dispute, claim or controversy sounds in contract, tort, equity or otherwise, and whether such dispute, claim or controversy relates to the meaning, interpretation, effect, validity, performance or enforcement of the Agreement, such dispute, claim or controversy shall be settled by and through an arbitration proceeding to be administered by the American Arbitration

Association in Oklahoma City, Oklahoma, in accordance with the American Arbitration Association's Commercial Arbitration Rules. Each of the Parties to this Agreement hereby agrees and consents to such venue and waives any objection thereto. The arbitrability of any such dispute, claim or controversy shall likewise be determined in such arbitration. Such arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules of the American Arbitration Association. Each Party will bear equally the costs and expenses of AAA and the Arbitrator. All arbitration proceedings shall be confidential, except to the extent that disclosure is necessary to enforce an arbitration award in a court of competent jurisdiction. Both the foregoing Agreement of the Parties to this Agreement to arbitrate any and all such disputes, claims and controversies and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the Parties hereto and may be specifically enforced by legal proceedings. **BY ENTERING THIS AGREEMENT, THE PARTIES HEREBY WAIVE THEIR RIGHT TO A TRIAL BY JURY AND TO BRING A CLASS ACTION FOR ANY CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PERFORMANCE THEREOF.**

18.    **Forum Selection**: Any dispute arising in any way from this Agreement or the Parties' business relationship that is found not to be subject to binding arbitration (regardless of reason) shall be subject to resolution exclusively in the State District Court of Oklahoma County, Oklahoma.

19.    **Interpretation / Joint Preparation**:  This Agreement and all IOs shall be interpreted and construed as if both of the Parties jointly prepared them.  Any uncertainty or ambiguity in this Agreement or any IO shall be not interpreted against a Party on the basis that the Party was the drafter. The Parties acknowledge that they each have the opportunity to have this Agreement and all IOs reviewed by legal counsel and that the persons executing the same have read and understood all terms.

20.    **Severability**:  If any provision of this Agreement is or becomes invalid, illegal, or unenforceable in any respect under any law, the validity, legality, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired.

21.    **Miscellaneous**:  Advertiser shall not sell, transfer or assign this Agreement, or any causes of action under this Agreement, without Quintessa's prior written consent. All headings contained in this Agreement are used for convenience or reference only and shall not limit or restrict the plain meaning of the language below such heading(s). All terms and provisions of this Agreement and each IO will be binding upon and inure to the benefit of the Parties hereto and their respective permitted transferees, successors and assigns.

22.    **Integration**:  This Agreement contains the entire understanding between the Parties regarding the services to be performed under this Agreement and supersedes all prior agreements. To the extent this Agreement contains any terms that are inconsistent with, conflict with, or contradict any provisions set forth in any other written contracts or agreements entered into between Quintessa and Advertiser—whether entered into before, contemporaneously with, or after this Agreement, including but not limited to any IO—the terms of this Agreement shall control and govern, and any other provisions of such contracts or agreements shall be read to give full effect and meaning to these terms, and any inconsistent, contrary or conflicting provisions of such contracts or agreements shall be disregarded unless they can be read together with and give full effect to the terms of this Agreement.

By signing below, each Party agrees to be bound by the terms of this Agreement.

QUINTESSA LLC

_____

Signature

_____7/23/2024_____

Date

KAREEMIYA

*Naveed Ahmad*

_____

Signature

_____7/23/2024_____

Date

**EXHIBIT A**

**Definitions**

The terms listed below, if and where used in the Agreement or in any applicable IO, shall have the following meanings and definitions:

1.  "**Advertisement**" refer to any marketing, advertising, and/or promotional materials of any kind, type, or format, whether written or electronic, as well as the contents thereof, to be used in a Campaign or that may be communicated to others (including Consumers) through any means or in any medium, including but not limited to any and all art work, creative materials, graphics, images, copy, or active URLs.  Where used, the terms "Advertising Material" or "Ad" should also be understood as referring to Advertisements.

2.  "**ATDS**" refers to any "automatic telephone dialing system" as that term is defined in the TCPA and interpreted by prevailing court decisions, and expressly includes "autodialers" or other commonly used variances of the term ATDS.

3.  "**Automated Call**" refers to any Call made for the purpose of communicating an Advertisement to a Consumer using an ATDS and/or involving an "artificial voice" or "prerecorded voice," where applicable, as those terms are defined in the TCPA and interpreted by prevailing court decisions.

4.  "**Call**" refers to any telephone call, text message (including MMS or SMS formatted messages), or other method of contact (e.g., emails or websites) made, initiated, published, or otherwise communicated to a Consumer pursuant to this Agreement and containing or reflecting an Advertisement.  A "Call" may include (for example) inbound, outbound, or transferred calls.

5.  "**Call Lead**" refers to the delivery of a Call derived from an Advertisement pursuant to this Agreement, as specified and set forth in an IO.

6.  "**Campaign**" refers to a specific advertising or marketing campaign, as specified and set forth in an IO.

7.  "**CASA**" refers to the California Anti-Spam Act, Cal. Bus. & Prof. Code § 17529, *et seq.*, and any other similar or equivalent state laws prohibiting or restricting unsolicited commercial e-mails.

8.  "**CCPA**" refers to the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.* and the related regulations, as amended from time to time, and any other similar or equivalent state Consumer privacy statutes and regulations.

9.  "**Consent**" means "prior express written consent" (as that term is defined in the TCPA and interpreted by applicable law) signed by a Consumer who is the intended recipient of a telephone call or text message, either in a physical writing or as otherwise provided in the TCPA and other applicable law or through a physical online opt-in by checking a box or filling out a form, that authorizes the calling party to "make" or "initiate" (as those terms are defined in the TCPA and interpreted applicable law) an Automated Call containing or reflecting an Advertisement to the specific telephone number authorized by the Consumer in said agreement.

10. "**Consumer**" refers to any individual or person who may view or receive an Advertisement or may be contacted or receive a Call pursuant to this Agreement, and potential customers or purchasers of any goods or services offered in or by an Advertisement or by the Client.  This term should be interpreted

broadly and further understood as including but not limited to the legal definition of "consumer" as stated in any applicable law that may apply to consumers and consumer privacy (e.g., the TCPA or CCPA) and this Agreement generally.

11. "**Lead Data Acquisitions**" refers to any data or information (e.g., name, address, and other contact or demographic information) regarding persons (i.e., "leads"), including Consumers, interested or potentially interested in receiving quotes, offers, other information relating to goods or services offered in, by, or pursuant to an Advertisement.

12. "**Deliverables**" refers to the type(s) and amount(s) of Inventory to be delivered, as specified and set forth in an IO.

13. "**DNC**" refers to all "Do Not Call" or "Do Not Contact" related issues under this Agreement (e.g., DNC lists, requests, rules, laws, regulations, etc.), including but not limited to any Call suppression lists.

14. "**FCRA**" refers to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.,* and any state equivalents thereof.

15. "**Insertion Order**" refers to a separate agreement between the Parties used to place an order under this Agreement and specifying the parameters, requirements, specifications, or limitations of any Deliverables or any Campaign.  Where used, "IO" or "Order" shall also refer to an Insertion Order.

16. "**Inventory**" means any services, data, or information to be provided or actions to be taken (e.g., acquisitions, calls, leads, etc.) pursuant to this Agreement, as specified and set forth in an IO.

17. "**Lead Data**" refers to any data or information (e.g., name, address, and other contact or demographic information) regarding persons (i.e., "leads"), including Consumers, interested or potentially interested in receiving quotes, offers, other information relating to goods or services offered in, by, or pursuant to an Advertisement.

18. "**Page**" refers to a page on a Site that is publicly accessible via the internet.

19. "**Party**" shall refer to one of the Parties.

20. "**Section**" refers to the numbered paragraphs and subparagraphs of this Agreement.

21. "**Site**" refers to a publicly accessible internet website.

22. "**TCPA**" refers to the Telephone Consumer Protection Act of 1991, any related implementing regulations promulgated by the Federal Communications Commission, and any state equivalents thereof.